```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| CYNTHIA LASORSA and FRANK LASORSA,<br><br>             Plaintiffs,<br><br>     v.<br><br>SHOWBOAT: THE MARDI GRAS CASINO and HARRAH'S ENTERTAINMENT,<br><br>             Defendants. | HON. JEROME B. SIMANDLE<br><br>Civil No. 07-4321 (JBS/JS)<br><br>**OPINION** |

APPEARANCES:

Robert Morici, Esq.
MORICI AND MORICI
1399 Franklin Avenue
Garden City, NY 11530
    Counsel for Plaintiffs Cynthia and Frank Lasorsa

Christopher C. Mauro, Esq.
CAMACHO MAURO MULHOLLAND, LLP
350 Fifth Avenue
Suite 5101
New York, NY 10118
    Counsel for Defendants Showboat - The Mardi Gras Casino and
    Harrah's Entertainment

**SIMANDLE**, District Judge:

    This matter is presently before the Court on the motion of Defendants Showboat: The Mardi Gras Casino and Harrah's Entertainment to preclude the testimony of Plaintiffs Cynthia and Frank Lasorsa's proposed expert Jeffrey Leif [Docket Item 33]. Plaintiffs offer Mr. Leif's testimony in this negligence action to support their claim that Defendants breached their duty to Mrs. Lasorsa when they allowed a wheelchair to remain partially

under a table in their restaurant so that Mrs. Lasorsa tripped over that chair and injured herself. Defendants argue that Mr. Leif is not qualified to offer an expert opinion in this area and further that his opinion is unreliable, so his testimony should be precluded. For the reasons set forth below, the Court will grant Defendants' motion and preclude Mr. Leif's proffered testimony.

## I.   BACKGROUND

### A.   The Accident

This action arose from an accident at the Pelican Club within the Showboat Casino in Atlantic City, New Jersey. On January 28, 2006, at approximately 5:45 p.m., Mrs. Lasorsa tripped on a wheelchair and fell to the ground. Plaintiffs maintain that Defendants negligently permitted the wheelchair to remain in the aisle and walking pathway at the Pelican Club and that their negligence led to Mrs. Lasorsa's fall and subsequent injury to her left elbow, which required surgery.

### B.   Mr. Leif's Qualifications and Report

Since 1962, Mr. Leif has worked within the food services industry. (Leif Resume.) For five years he was Regional Vice President for a steak and salad bar theme restaurant, followed by positions as a field supervisor for food services, general manager in a national restaurant and food service chain (at Rockefeller Center Restaurants and Lincoln Center, among other

locations), and general manager at a private club in New York City.  (Id.)  He is presently an independent consultant, broker, and food sales representative -- a position he has held since 1997.  (Id.)  He has consulted for Princeton University, LifeThyme Food Market, Peltz & Walker, The River City Brewing Company, the Helen Hayes Performing Arts Center, and 3 Clock Inn Restaurant.  (Id.)  It appears that no court has ever held Mr. Leif to be an expert for any purpose.  There is similarly no evidence that Mr. Leif has any particular expertise in restaurant safety, whether by specified training or education.

In response to Plaintiffs' request, Mr. Leif prepared a report expressing his views of the conduct of Defendants surrounding Mrs. Lasorsa's accident.  A copy of Mr. Leif's report is attached hereto as Appendix A.  To come to his opinions Mr. Leif reviewed: (1) the deposition transcripts of four Showboat employees; (2) the deposition transcripts of Cynthia and Frank Lasorsa; (3) Mrs. Lasorsa's notes of the accident; (4) the Showboat Encounter Form and Incident Report for the accident; and (5) a diagram of the layout of the Pelican Club provided by Showboat, along with employee rosters, details of covers and seating for the day of the accident.  (Leif Report at 1.)

Mr. Leif begins his report by summarizing the deposition testimony of various witnesses, highlighting testimony indicating that Showboat did not have a formal policy for storing the

wheelchairs of handicapped customers.  (Id. at 1-2.)  Mr. Leif then presents a question to be answered:

> Did The Showboat Casino's Diamond Club[1] have the general welfare taking [sic] reasonable precautions to meet the standard of care to protect its patrons, including Cynthia Lasorsa from being of risk, [sic] tripping and falling over a wheelchair in the aisle next to her table [on] Saturday, January 28, 2006[?]

(Id. at 2.)  Mr. Leif responds in the negative, and elaborates on his opinion as follows:

> It is my opinion within a reasonable degree of certainty in my field of expertise, restaurant/catering owner and hands on manager, [that] the defendant did not prioritize the safety of the patrons.  Showboat Casino's Diamond Club's concern [sic] and lack of awareness [given] its many years of operating a Buffet Dinning [sic] Room, demonstrates a below industry standards an[d]/or below the standard of care of a reasonable [person] operating [a] buffet dinning [sic] room.

(Id. at 3.)  Mr. Leif then provides four bases for his ultimate opinion: (1) Showboat did not have a written policy regarding the placement of wheelchairs; (2) Based on their "practical experience," Showboat managers should have been aware of the risk and told guests who left their wheelchairs that those chairs would be stored in a separate, designated storage area; (3) "The aisle between tables was not a practical area to store a

---

[1] Though the Joint Final Pretrial Report calls the location of the accident the "Pelican Club," it appears that a special Diamond Card was needed to access the Showboat Pelican Club and so Mrs. Lasorsa, at least once, refers to the club as the "Diamond Club."  (Cynthia Lasorsa Dep. at 22-23, 24.)

wheelchair;" and (4) "Being responsible and being in charge of a dinning [sic] room is being aware of the activities in the dinning [sic] room at all times."  (Id.)

### C. Procedural History

On September 10, 2007, Plaintiffs filed their present complaint bringing claims of negligence and, on behalf of Mr. Lasorsa, loss of consortium, and asserting diversity jurisdiction.  This action is presently scheduled for a jury trial to begin on September 14, 2009.

On August 13, 2009, Defendants submitted the instant motion in limine asking the Court to preclude Mr. Leif's proposed expert testimony.  On September 1, 2009, the Court convened a telephone conference on the record to discuss whether a hearing should be held, including testimony of Mr. Leif, before the Court decided the motion to preclude.  Defendants suggested that, to the extent the Court felt such a hearing was necessary, more information regarding Mr. Leif's experience might be helpful.  Plaintiffs argued that no hearing was necessary.  Neither party sought oral argument.  The Court stated it will rely upon the information about Mr. Leif's experience as submitted by Plaintiffs, and that no further evidence would be needed to decide the motion.

**II. DISCUSSION**

The admissibility of expert witness testimony is governed by Rule 702, Fed. R. Evid., and the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny. Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court explained in <u>Daubert</u>, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702. <u>Id.</u> at 590-91; <u>see</u> <u>also</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 146-47 (1999) (holding that <u>Daubert</u> extends to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted).

Under the law of this Circuit, <u>Daubert</u> and Rule 702 call upon the Court to examine the admissibility of expert testimony in light of three factors: the qualifications of the expert, the reliability of his or her methodology and the application of that methodology, and whether the testimony fits the matters at issue

6

in the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994).  With regard to the qualifications prong, the Court of Appeals has explained that an expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such."  Id. at 741.

In addition to being qualified to testify in an expert capacity, an expert witness whose testimony is offered by a party must base her opinions on reliable methodology.  The Court of Appeals explained in Paoli that

> Daubert explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.  In sum, Daubert holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.

Id. at 742 (internal quotations and citations omitted).  Recognizing that the "inquiry as to whether a particular scientific technique or method is reliable is a flexible one," the Court of Appeals has identified a nonexhaustive list of eight factors[2] that courts may address in determining whether an

---

[2] The factors identified by the Court of Appeals for assessing the reliability of an expert's methodology are:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the

expert's methodology is reliable. Id.; see also Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999).

Finally, to be admissible under Rule 702, expert testimony must "fit," or be relevant to, the facts at issue in the case. Paoli, 35 F.3d at 743. "Because Rule 702 demands that the expert testimony assist the trier of fact, such testimony will be admissible only if the research is sufficiently connected to the facts and issues presented in a given case." Suter v. General Acc. Ins. Co. of America, 424 F. Supp. 2d 781, 787 (D.N.J. 2006) (citing Paoli, 35 F.3d at 743). In other words, Rule 702's relevance standard requires that there be "a valid scientific connection" between the expert's testimony and the facts and issues in the case in order for the expert's testimony to be admissible. Paoli, 35 F.3d at 743.

Mr. Leif's proposed expert testimony raises two major concerns for the Court. First, despite Mr. Leif's almost forty years in the food services industry as a "restaurant/catering owner and hands on manager," his resume reveals that he has no particular expertise in restaurant safety, nor has he ever been

---

      technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742, n.8.

8

designated as an expert in any field.  Second, his general experience within the industry might satisfy the liberal requirements for expertise if his expert report reflected an opinion based on objective standards and technical knowledge required for his field but not readily understood by a lay person.  His report does not provide such assistance.  Because Mr. Leif's report lacks any objective methodology and falls into the realm of everyday commonsense, for the reasons explained below, the Court will preclude his testimony under Rule 702.[3]

Mr. Leif has applied no objective methodology to come to his opinion, instead impermissibly relying on the ipse dixit of the expert.  See Kumho Tire, 526 U.S. at 157 ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert") (internal citations omitted).  It is clear from Mr. Leif's report that he reviewed

---

[3] While in certain circumstances courts are required to hold a Daubert hearing and provide a plaintiff the "opportunity to be heard" before excluding a proposed expert, Padillas v. Stork-Gamco, Inc., 186 F.3d 412 (3d Cir. 1999), Oddi v. Ford Motor Co., 234 F.3d 136, 152 (3d Cir. 2000), such a hearing is not required here.  Plaintiff's counsel has expressly declined the opportunity for a hearing, arguing that a hearing is not necessary and that the sum total of Mr. Leif's expertise, methodology, opinion, and its bases are described in Mr. Leif's report and resume.  Moreover, the Court is able to discern Mr. Leif's methodology and reasoning based on the present record.  In this circumstance a Daubert hearing is not necessary.  See Player v. Motiva Enterprises LLC, No. 02-3216, 2006 WL 166452, at *4-5 (D.N.J. Jan. 20, 2006) (no hearing necessary where methodology and reasoning in expert report is clear and plaintiff has not requested a hearing).

the listed material and came to his own conclusion without reference to any recognized industry standards or general practices, instead postulating that Showboat demonstrated "a below industry standards an[d]/or below the standard of care of a reasonable [person] operating [a] buffet dinning [sic] room." (Leif Report at 3) (emphasis added).  He did not compare the use and storage of wheelchairs in other similar restaurants, or look to examples of "a written policy or program" regarding the placement of patrons' wheelchairs at other establishments.  He looked to no restaurant design criteria nor any educational training that covers wheelchair placement in restaurants.  Rather, the gist of Mr. Leif's report is that had Mr. Leif been in Defendants' position, he would have handled things differently.  Mr. Leif's subjective belief, unsupported by objective methodology, is not admissible under Rule 702.

     The Court finds support for its opinion in Grninich v. Bradlees, 187 F.R.D. 77 (S.D.N.Y), where the district court precluded plaintiff's proposed expert testimony regarding a department store's method for displaying ironing boards in a personal injury action against the store.  The Grninich court excluded the expert's testimony regarding the proper way to store ironing boards because the expert could not point to any industry standards, "other than general common-sense guidelines," regarding proper display.  187 F.R.D. at 81.  The court concluded:

10

> Without "industry standards" to rely upon, [the expert] seems to base his conclusions on his own authority.  Because "knowledge connotes more than subjective belief or unsupported speculation," Daubert, 509 U.S. at 590[], there is no reliable foundation for [the expert's] expert testimony.

Grninich, 187 F.R.D. at 82.  Similarly here, Mr. Leif relies on his own subjective belief, without objective support, and so his report lacks any reliable foundation.  By contrast, where safety expert testimony has been admitted, the expert used on reliable publications and years of expertise within the field of safety.  Wisdom v. TJX Cos., Inc., 410 F. Supp. 2d 336, 342 (D. Vt. 2006) (expert testimony regarding use of clothing rack in personal injury case admissible where expert took into account reliable publications and had years of experience operating a bona fide retail safety consulting business).  Without a reliable, objective basis for Mr. Leif's testimony, stemming from identifiable industry standards, codes, publications or training, it must be precluded under Rule 702.

　　　Moreover, the Court finds that Mr. Leif's proposed testimony will not assist the jury in this matter and should also be precluded on this ground.  Expert testimony is admissible only where the expert offers specialized knowledge beyond the ken of the average person.  Fed. R. Evid. 702.  "When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is

11

improper." Frase v. Henry, 444 F.2d 1228, 1231 (10th Cir. 1971); Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1065 n. 9 (9th Cir. 2002) ("To be admissible, expert testimony must address an issue beyond the common knowledge of the average layman.") (citations omitted).

    Mr. Leif's proposed testimony addresses matters that jurors are well-equipped to handle on their own, without expert assistance. He bases his opinion regarding Defendants' conduct on the alleged absence of any plan regarding the placement of wheelchairs (a factual determination to be made by the jurors), consideration of Defendants' own practical experience managing a restaurant, the fact that the aisle between tables is "not a practical area to store a wheelchair," and his opinion that a responsible restaurant manager should be aware of the activities in his dining room. (Leif Report at 3.) Jurors are capable of determining all of these facts without the assistance of any specialized knowledge. See Grdinich, 187 F.R.D. at 82 ("a juror needs no specialized knowledge or expertise to understand whether ironing boards are safely displayed"). Nothing in Mr. Leif's own background, in light of his lack of any particular expertise in safety, or his report, given the absence of any objective standards unknown to a layperson or comparative analysis, indicates that he needed special expertise to come to his conclusion. Cf. Wisdom, 410 F. Supp. 2d at 341 (expert opinion regarding clothing rack design will assist jury where expert had

"extensive background in retail safety" and offered experience "to assess the often subtle safety implications of different rack designs").

Without a reliable opinion that will offer specialized knowledge to assist the jury, Mr. Leif's testimony is inadmissible under Rule 702.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to preclude the expert testimony of Jeffrey Leif.  The accompanying Order shall be entered.


**September 9, 2009**                          　s/ Jerome B. Simandle
Date                                                        JEROME B. SIMANDLE
                                                            United States District Judge

13

5 Indian Hill Lane  
Palisades, NY 10964  
845-359-6854  
e-mail-jgleif@hotmail.com

January 19, 2009

William B. Baier  
Morici & Morici, LLP  
1399 Franklin Avenue, Suite 202  
Garden City, NY 11530  
wbaier@moricilaw.com

Re: Lasorsa v. Showboat Casino

Dear Mr. Baier,

Per your request, I have reviewed the following materials regarding the above mentioned case:

1. Four depositions transcripts of witnesses from the defendant Showboat
2. Deposition transcripts of the plaintiff and her husband
3. Notes from the plaintiff regarding the occurrence of the accident
4. Showboat Casino Encounter form
5. Showboat Incident report
6. Defendant Showboat's Response to Discovery and Inspection including layout of Pelican Club, employee rosters and details of covers and seating for the date of the accident.

**Deposition Testimony**

**The testimony of Hologue Keyes McVeigh** indicates that she was responsible for making sure that the guests checked in at the door, (Deposition of Halogue Keyes McVeigh, page 6, line 2&3). Her testimony continued that once guests are greeted at the podium, during the busy time the guests would be "led" to a table that was not occupied. <u>If it was not busy the guests would seat themselves.</u> (Deposition of Halogue Keyes McVeigh, page 14, lines 9-12).

Also Ms. McVeigh, testified the manager Deb Blackburn, (Deposition of Halogue Keyes McVeigh, page, lines 7-10), and the other shift manager, Heather Vernile, (Deposition of Halogue Keyes McVeigh, page 8, line 8 & 9), did not have any type of policy or safety measures regarding handicapped patrons that came to the Diamond Club. (Deposition of Halogue Keyes McVeigh, page 22, line 25 and page 23, lines 1-3).

It further states the Diamond Club did not have any kind of handbook or rule book, regarding policy procedures for the Diamond Club in January 2006. (Deposition of Hologue Keyes McVeigh, page 32, lines 21-24).

p.2

The testimony further points out that Ms. McVeigh did not receive any specific training as to handling senior citizens. (Deposition of Hologue Keyes McVeigh, page 35, lines 10-12, and 15). It's further noted Ms. Blackburn or Ms. Vernile did not have any discussions regarding special attention which should be given to senior citizen customers. (Deposition of Hologue Keyes McVeigh, page 35, lines 16-20).

**The testimony of Deborah B. Blackburn, Player Service Manager.** (Deposition of Deborah B. Blackburn, page 5, line 21). States, she has been the Player Service Manager for 3 going on 4 years. (Deposition of Deborah B. Blackburn, page 6, lines 7 & 8).

Ms. Blackburn makes no mention of a "House Policy", as to the seating of guests with wheelchairs or walkers. It is further noted, there wasn't a written policy as to the specific location for the storage of a wheel chair or walker when the guest decided to utilize a dinning room chair at a dining table. Ms. Blackburn continues, in the year 2006, there wasn't a storage area for said wheelchairs or walkers. (Deposition of Deborah B. Blackburn, page 18, lines 16-25, page 19, lines 1-25, and page 20, lines 1-3).

**The testimony of Heather Vernile Player Services Supervisor**, (Deposition of Heather Vernile, page 5, line 6). Ms. Vernile testimony describes the table set up, (floor plan), of the Diamond Club, regarding the number of seats at the tables, either two or four, and the space between the tables as no more than four to five feet. (Deposition of Heather Vernile, page 12, lines 22-25, and page 13, lines 3-12).

The testimony states that Ms. Vernile received general training when initially hired and there after a lot of on the job training. Each quarter Harrah's gave only fire prevention training. (Deposition of Heather Vernile, pages 14, lines 14-25, and page 15, lines 1-4).

**The testimony of Cynthia Lasorsa, Plaintiff,** (Deposition of the Cynthia Lasorsa, page 1 lines 16-17). Ms. Lasora testified, upon getting up from the table to go to the bathroom she turned to her left and took a step and fell. Once on the floor, she turned and observed that she had tripped over a wheelchair. (Deposition of Cynthia Lasorsa, page 28, lines 7-19).

**Opinions:**

**Questions:** Did The Showboat Casino's Diamond Club have the general welfare taking reasonable precautions to meet the standard care to protect its patrons, including Cynthia Losorsa from being of risk, tripping and falling over a wheelchair in the aisle next to her table, Saturday, January 28, 2006.

p.3

Answer:    No.

It is my opinion within a reasonable degree of certainty in my field of expertise, restaurant / catering owner and hands on manager, the defendant did not prioritize the safety of the patrons. Showboat Casino's Diamond Club's concern and lack of awareness for its many years of operating a Buffet Dinning Room, demonstrates a below industry standards an/or below the standard of care of a reasonable operating buffet dinning room.

The reasons for my opinion include the following:

1. It seems to me Management didn't have a written policy or program to carry out a plan to "police" the placement of wheelchairs, when a guest elected to sit in a dinning room chair instead of his wheelchair, at a dinning table in the Diamond Club's buffet room.

2. Management should have been aware based on practical experience. Guests who have the need to use a wheelchair, but may have decided at the time of dinning, to use a dinning room chair instead of their wheelchair, should have been informed that the wheelchair would be placed away from the table in the designated storage area or in a selected seperate space provided for wheelchairs.

3. The aisle between tables was not a practical area to store a wheelchair, and at the same time to allow a guest reasonable space to stand up and walk "freely" from the table.

4. Being responsible and being in charge of a dinning room is being aware of the activities in the dinning room at all times.

**In conclusion, I feel that Showboat Casino's Diamond Club Management did not manage their business during this particular time.**

**Their fundamental understanding of management, which is controlling and directing, and their basic procedures regarding their primary responsibilities for a safe environment during this occasion are below the standard for the industry and below the standard towards the customer.**

Sincerely,

Jeffrey G. Leif